Filed 5/1/15  P. v. Scott CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069942 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F04720) |
| v. | |
| ROBERT LEE SCOTT, JR., | |
| Defendant and Appellant. | |

Defendant Robert Lee Scott, Jr., appeals from a judgment of conviction following a court trial.  Defendant was charged with four counts related to allegations that he molested his daughter, A.S., multiple times when she was ages seven through nine years old.  The information also alleged that he suffered three prior serious convictions, one of which was a robbery conviction from Texas.  Defendant pleaded not guilty to the charges and denied the enhancements.  After an unsuccessful *Marsden*[1] motion, defendant opted

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

to represent himself at trial but requested advisory counsel, which the court denied. Subsequently, defendant waived his right to a jury trial and following a court trial, the court found defendant guilty as charged. The court also found his prior convictions true. After denying defendant's motion to strike the strike allegations, the trial court sentenced defendant to an indeterminate term of 223 years to life plus a determinate term of 60 years.

On appeal, defendant contends that: (1) the evidence was insufficient to establish his guilt; (2) the trial court abused its discretion in declining to appoint advisory counsel to aid him at trial; (3) the trial court abused its discretion in denying his *Romero*[2] motion to strike his prior strikes; and (4) the evidence was insufficient to prove that his prior conviction for a Texas robbery was a serious or violent felony qualifying as a prior strike and the serious felony enhancement. The People agree with defendant that the case should be remanded for retrial on the strike allegation and the five-year serious felony enhancement related to the Texas robbery conviction.

We conclude that there is substantial evidence supporting defendant's guilt in this case where A.S.'s testimony was specific enough under the *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*) test, and her testimony was not physically impossible or inherently improbable. We also conclude that the court did not abuse its discretion in declining to appoint advisory counsel because defendant failed to make the requisite showing of need. We do, however, agree with defendant and the People that remand for retrial on the Texas robbery strike allegation is warranted, because the evidence presented at trial was insufficient to establish that this conviction meets the definition of a California serious felony. Lastly, we conclude that the court did not abuse its discretion in denying defendant's motion to strike the strike allegations.

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

We reverse and remand for retrial as to the Texas robbery serious felony allegation, but affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendant was charged in the First Amended Information with the following counts:

**Count One** - Lewd and lascivious acts with a child under the age of 14 (Pen. Code, § 288, subd. (a)), occurring on or about November 30, 2006;[3]

**Counts Two** - Sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a)), occurring on or about and between December 2, 2006, and July 13, 2007;

**Count Three** - Substantial sexual conduct with a child under the age of 14 (§ 288.5, subd. (a)), occurring on or about and between July 14, 2007, and December 1, 2008;

**Count Four** - Sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a)), occurring on or about and between December 23, 2008, and January 6, 2009.

The information also alleged that defendant had suffered three prior serious felony convictions. (§§ 667, subds. (a)-(i), 1170.12.)

### *Marsden* and *Faretta* Motions

In May 2011, a doubt was declared as to defendant's competence and proceedings were suspended pursuant to section 1368. In June 2011, while proceedings had been suspended, the trial court heard and denied a *Marsden* motion for substitution of counsel. In July 2011, after counsel submitted the question of defendant's competency on the

---

[3] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

doctor's reports, the court found defendant competent to stand trial. In August 2011, defendant filed and withdrew *Marsden* and *Faretta*[4] motions. In September 2011, defendant made another *Faretta* motion. The trial court gave defendant *Faretta* warnings and granted his motion. In November 2011, defendant waived his right to a jury trial.

**The Prosecution's Evidence**

The People presented A.S.'s testimony, a transcript and recording of A.S.'s SAFE interview, and the testimony of D.W., A.S's mother.

### A.S.'s Testimony

A.S. testified that defendant molested her exactly ten times between November 2006 and just after Christmas 2008, when A.S. was ages seven through nine years old. At the time of the trial, she was twelve years old. A.S. was born in July 1999, and defendant left the family home when she was fifteen months old.[5] In November 2006, defendant reunited with A.S.'s mother, D.W., when he came to visit her after his release from prison, and they were married on December 29, 2006. A.S. was seven years old at that time and had been raised by D.W. and D.W.'s brother, K.W., in Sacramento. A.S.'s uncle, K.W., often took care of A.S. while D.W. was working. When defendant moved into D.W.'s home, he began watching A.S. as well.

A.S. testified that during defendant's first visit to the family home after his release from prison, he began molesting her. She testified that the first time was while she was watching television with defendant in the living room and D.W. was taking a shower. Defendant was sitting in a chair near the couch and asked A.S. to come sit on his lap. When she did, defendant placed his hand down her sweatpants inside her underwear and felt around her vagina. Defendant continued to touch A.S. in this manner until they heard

---

[4] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta*).

[5] Defendant was serving time in prison for most of A.S.'s early life.

the shower door close. Defendant then told A.S. to sit back on the couch. When D.W. came out from the shower, A.S. did not tell her what happened. A.S. explained that her mother had previously instructed her to obey her father.

A.S. testified that the second incident occurred approximately a week after the first incident and was the first act of sexual intercourse. She and defendant were alone in the house while D.W. was at work. Defendant told A.S. to go to her mother's bedroom, and he followed her. Defendant then directed A.S. to take off her clothes and lay on the bed. A.S. removed her clothes as she was instructed, and defendant removed his clothes. Defendant then put oil on his penis and climbed on top of A.S. Defendant then had sexual intercourse with his seven-year-old daughter. Defendant did not say anything to A.S. while he forced himself on her, but had a "weird smile on his face." The oil burned A.S.'s vagina. A.S. testified that defendant kept his penis inside her vagina until "white stuff" came out between her legs, which A.S. saw when defendant got off of her. Defendant then instructed A.S. to change her underwear and not to tell anyone what happened. A.S. did not tell her mother about this second incident.

About two days later, again while D.W. was working, A.S. was sitting on the couch and watching television when defendant instructed A.S. to go to the bedroom and take her clothes off. Defendant again had sexual intercourse with his daughter. Defendant repeated this every time he was alone in the house with A.S. while her mother went to work and K.W. was away, exactly nine times (for a total of ten molestations including the initial fondling).

A.S. testified that D.W. did not work often because she had a part-time position working in the Arco Arena parking lot during Sacramento Kings games but did not work during every game because she did not have seniority. The last molestation occurred shortly after Christmas in 2008. A.S. remembered that her mother had gone to work and asked defendant and A.S. to clean up the Christmas tree. After they finished cleaning up the tree, defendant again had sexual intercourse with A.S. as he had done on eight other

5

occasions. In January 2009, shortly after the last incident, defendant left the home but maintained telephone contact with A.S. after that.

A.S. testified that she complained to her mother several times about what defendant was doing to her. The first time A.S. reported the molestations to her mother, D.W. began crying. D.W. then confronted defendant, and he denied any abuse. Even after A.S. reported the molestations to her mother several times, defendant continued to molest A.S. A.S. stopped reporting to her mother because she felt that her mother was not listening to her and was determined to keep defendant in the home to provide A.S. with a father because D.W. grew up without a father in her life.

When A.S. was in the fourth grade, in November 2009, she went on a trip to Six Flags and confided in a friend, F.J., that her father had been having sexual intercourse with her. About a week later, A.S. was called to the principal's office at school regarding the molestation allegations, which F.J. had reported. The principal, Flora Reed, appeared to know about what A.S. had told F.J. The principal asked A.S. why she had not reported the molestations to an adult and told her that she should have done so. Ms. Reed then arranged for A.S. to speak with a police officer at the school. A.S. told the officer that during several of the incidents, defendant put his penis in her buttocks. However, at trial, A.S. explained that she did not understand about sex at the time of the report. To her, defendant was "touching [her] vagina and [her] butt when his penis went in the front." But defendant's penis never went "in [her] butt." She further clarified that each time defendant put his penis inside her vagina, he penetrated inside her all the way to the base of his penis. When the prosecutor asked A.S. how defendant penetrated her, she said that he went "[a]ll the way to the butt," which was similar to her initial statement to the police officer at her school.

During her cross-examination, A.S. testified that defendant gave her a cell phone for her eighth birthday. Defendant bought the phone for A.S. after winning $20,000 in the lottery. Although the phone was a birthday gift, A.S. believed that it was also a gift in

6

exchange for sexual intercourse because her mother did not want her to have a phone due to her age. Nevertheless, D.W. paid the monthly cell phone bill. A.S. believed that if she continued to allow her father to molest her, he would continue to give her gifts.

**A.S.'s SAFE Interview**

A.S.'s trial testimony was generally consistent with her SAFE interview, conducted on April 22, 2010. A video of the SAFE interview, People's Exhibit 1, was played during the trial, and the transcript of the interview, People's Exhibit 1-A, was also admitted as evidence. During her SAFE interview, A.S. described many details about the molestations that matched her trial testimony and included some details that were not developed by counsel at trial. For example, A.S. explained that the first molestation occurred on a Friday night after the family went out for pizza, the day after defendant came to Sacramento to visit following his release from prison. She also explained that during the first molestation, when defendant had A.S. sit on his lap, defendant touched inside her "front part." She was able to describe in detail, consistent with her trial testimony, what she was wearing, where she and defendant were positioned in the living room, and how defendant touched her. She stated that when she tried to move away from defendant, he pulled her back on his lap. She said that defendant had a "weird kinda laugh" while he was touching her. Later in the SAFE interview, A.S. clarified that defendant touched her front area and her back area at the same time with his hand and arm. Specifically, she said that he touched in between her buttocks. Importantly, A.S. stated that her mother "came down the hallway" after getting out of the shower but never mentioned the word "upstairs" or anything implying that there were stairs in the home during the course of her SAFE interview.

During the SAFE interview, A.S. also described the next molestation when defendant took her to her mother's bedroom in detail and consistent with her trial testimony. She said that this second molestation occurred on a weekend day during the late afternoon or early evening while her mother was at work. A.S. recalled that she was

7

alone in the house with defendant for approximately two hours between the time her mother left for work and the time her uncle returned home. She explained that defendant put baby oil on his penis, and when he had intercourse with her, it burned and hurt her. She said that she did not think that defendant cared that he was hurting her. A.S. also said that defendant had his hands on her shoulders while he was having intercourse with her, holding her down on the bed when she tried to move. She explained that defendant moved up and down for a while and then "eventually white stuff came out." She said that defendant then took a towel and rubbed off "the white stuff," instructed A.S. to change her underwear, and put the bed sheets in the washing machine.

A.S. also described the last molestation during her SAFE interview, explaining that it was after Christmas when she was nine years old. She remembered that the pine needles from the Christmas tree were shedding on the floor, and D.W. had asked defendant and A.S. to clean up the Christmas tree while she was at work. She said that after cleaning up the tree and putting it in the dumpster, defendant told her to "go in the bedroom with him and the same thing happened again." She said that it caused her "front part" to burn because he used petroleum jelly.

A.S. also reported that after her mother kicked defendant out of the house in January 2009, A.S. would still talk to him on the phone, often on a three-way call with her stepbrother. Consistent with both her trial testimony and F.J.'s statement later admitted in evidence by defendant, A.S. explained that she told F.J. about the molestations in November 2009, almost a year after the last molestation. While A.S. had told her mother about the abuse several times early on, she stopped reporting it to her mother because her mother did not believe her. A.S. stated that D.W. thought A.S. did not want defendant in the home.

Finally, A.S. reported that on one occasion, while her mother was watching a movie in the bedroom, defendant was on the computer in the living room looking at pornographic web sites. A.S. walked by him, and defendant called her to sit on his lap

8

while he was looking at the videos. A.S. said that he searched for "how to have better sex" on the computer in front of her and opened videos of people having sexual intercourse. A.S. said that she told her mother, "mom, look what daddy's doing," but when her mother came into the living room, defendant had already closed the videos. A.S. also reported that later on, D.W. told her that there were similar allegations against defendant in 1995.

**D.W.'s Testimony**

D.W. testified that she married defendant in December 2006 and divorced him in December 2008. She and defendant had a child, A.S., together about seven and a half years before they married. D.W. testified that defendant left the home when A.S. was about a year old and returned to live with them when A.S. was seven years old, in January 2007. She explained that defendant was paroled in California in 2006 and began visiting in November 2006. He visited "a lot" until he moved into their home in January 2007; he would stay two to three days, sometimes during the weekend and sometimes during the week. She also testified that at one point during their two-year marriage, defendant moved out of her home for a few months.

D.W. began working at the Arco Arena parking lot a couple of weeks after defendant moved in. She worked intermittently and usually during the evenings. In total, D.W. worked during five or six Kings games that season because she started working mid-season and did not have seniority. D.W. further testified that A.S. and defendant were often alone in the house together on the occasions she worked. When he first moved into the house, defendant did not have permission to pick up A.S. from school, and she would often stay at an afterschool program until 6:00 p.m. At some point after he moved into the house, defendant was allowed to pick up A.S. from school as well.

In early 2007, A.S. reported to her mother that defendant was touching her inappropriately. D.W. said that A.S. complained about the touching more than once. When D.W. confronted defendant about the allegations, he denied it and began crying.

9

She then asked A.S. if she was sure that it happened and told her, "Well, [A.S.], if he did it, he did it. But don't say he did it just because you don't want him here." D.W. testified that A.S. never retracted her accusations. At one point after A.S. reported the abuse to her mother again, D.W. warned her she could be removed from the household if defendant was molesting her and that she could get in trouble for making a false statement if she falsely reported the abuse. She explained that she did not want to believe A.S. because she loved defendant and wanted to stay with him. She thought that A.S. just resented their relationship and wanted defendant out of the house. D.W. testified that at times, when she and defendant were holding hands, A.S. would come between them. She thought that A.S. was lying because she had lied sometimes in the past. Consequently, D.W. only confronted defendant about A.S.'s allegations once despite the fact A.S. reported it to her mother multiple times.

D.W. confirmed A.S.'s testimony that defendant bought a cell phone for A.S. when she was seven years old. D.W. did not want A.S. to have a cell phone at that age, but defendant bought a phone for A.S. anyway. However, D.W. paid the monthly phone bill. A.S. lost the cell phone at one point and became angry. D.W. felt that defendant gave A.S. too many gifts and toys; however, she said they were usually given on appropriate occasions such as holidays and birthdays. She also confirmed A.S.'s testimony about the report to the principal. D.W. testified that in November 2009, the principal at A.S.'s school, Ms. Reed, contacted D.W. and informed her that A.S. reported that she had been molested. By this time, D.W. and defendant had been divorced for nearly a year.

### Defense Evidence

Defendant testified in his own defense. Additionally, he presented testimony from two physicians who examined A.S. after she reported the abuse, K.W.'s testimony, and F.J.'s witness statement.

10

**Defendant's Testimony**

Defendant denied ever touching A.S. inappropriately.

Defendant testified that he met D.W. in 1998 after he was released from federal custody for a bank robbery conviction. Defendant admitted that prior to that conviction, he had been convicted and served time in prison for another robbery in Texas. He admitted that he was convicted of attempted robbery on September 1, 1977, in Los Angeles County, and convicted of bank robbery on December 8, 1986, in the United States District Court of the Southern District of California.

Defendant explained that D.W. became pregnant with A.S. several months after he began dating her. Defendant testified that after A.S. was born in July 1999, defendant took care of her part of the time and then fulltime once D.W. returned to work in November. In May 2000, federal marshals arrested defendant for failing to report to probation, and he was transferred back to San Diego. Several months later, in August 2000, defendant was transferred back to Texas on a warrant for a parole violation. Defendant testified that while imprisoned in Texas, he completed his Associate of Arts ("AA") degree, earned a certificate in data processing, became a peer health educator, and participated in a youth outreach program.

Defendant was paroled to Pomona, California, where his family lived, in November 2006; however, he flew directly to Sacramento to visit D.W. and A.S. for the weekend before reporting to Pomona. He arrived late at night and did not see A.S. until the next day. As A.S. described in her testimony, the next day was a school day for her, and the family went out for pizza that night. However, defendant denied touching A.S. while D.W. was in the shower that night. Defendant testified that the following day, the family went to a miniature golf course, and defendant disciplined and spanked A.S. because she nearly hit several people with the golf balls. He testified that after he disciplined A.S., she had a tantrum and told him, "I am going to get you if it's the last thing I do." Later that month for Thanksgiving and again for Christmas, D.W. and A.S.

11

visited defendant in Pomona. During the Christmas visit, on December 29, 2006, defendant and D.W. were married.

After he and D.W. were married, defendant's parole was transferred to Sacramento and he moved into D.W.'s home. Defendant had visited D.W. and A.S. frequently before his parole was transferred. Defendant testified that D.W. was not working during this time period and did not get the job at Arco Arena until April 2007. In March 2007, defendant began working in construction and continued that work until the end of the year. In November and December of 2007, he worked fulltime for a senior citizens' home. Defendant contended that he worked mostly fulltime throughout the year of 2007 and was home alone with A.S. on only a few occasions.

Defendant testified that while he was living with D.W. and A.S., he observed A.S. watching television shows that he believed were inappropriate for a child of her age, such as Jerry Springer and Dr. Phil. He stated that A.S. accused him of raping her during the summer of 2007. Defendant claimed that both D.W. and K.W. lectured her for lying, and D.W. asked A.S. whether she wanted to get her mother and uncle in trouble. He said that he cried following A.S.'s accusation because he thought that his own child did not want him in the house. He admitted that he and A.S. did not get along, and A.S. did not want defendant and her mother holding hands and being affectionate. Later in 2007, the family went to counseling together. Defendant testified that the cell phone he gave A.S. was a compromise gift for her birthday because she really wanted a dog and D.W. did not want animals in the home or the yard. He also explained that the only other gifts he purchased for A.S. were Christmas gifts that were not exorbitant.

By the end of 2007, defendant and D.W. were having marital problems, and D.W. filed for a divorce in early 2008. Between January 7, 2008, and April 16, 2008, defendant served time in "Rancho [*sic*] Cosumnes Correctional Center" for another parole violation. When he was released, he moved to a transitional living facility in Rancho Cordova. Defendant testified that during this separation from his wife, D.W. still

12

wanted to continue a relationship with him but no longer wanted to be married to him because she was concerned that he would ruin her credit. Defendant moved back into D.W.'s home in May 2008. The divorce was finalized on December 8, 2008. That month, defendant stayed at his father's home in Pomona until around December 29 or 30, when he returned to find that D.W. had packed all his clothes and was dating another man. He moved out of D.W.'s home permanently on January 6, 2009.

Defendant testified that in November 2009, A.S. called defendant to tell him that she wanted various toys and a video game console for Christmas. Defendant did not have a job at that time and was unable to get A.S. any Christmas gifts. He claimed he did not hear from her again after that, and then in June 2010, Detective Lawrie contacted him to interview him about the molestation accusations. In August 2010, police officers came to his father's home in Pomona with a warrant for his arrest, and he turned himself in.

**Medical Expert Testimony**

Defendant called Dr. Angela Rosas, a medical child abuse expert, to testify. Dr. Rosas examined A.S. on January 7, 2010, which was a little over a year after the last reported molestation. Dr. Rosas testified that A.S.'s anal and genital examinations were normal. However, these findings did not confirm or negate A.S.'s report that she was sexually abused. Dr. Rosas testified that she would expect to find a normal examination in a child who reported nine instances of vaginal penetration over the course of approximately two years, "particularly in a child who is examined years after the last episode." Based on her experience of examining over 2,000 children in A.S.'s age range for child sexual abuse and the literature involving studies on the subject, after a child sexual abuse victim heals, it is impossible to distinguish a child's examination with healed trauma from a normal child's examination approximately 80 percent of the time.

Dr. Sammy Chang, A.S.'s pediatrician, also testified. Dr. Chang testified that he treated A.S. for vaginitis, with symptoms of vaginal itching and painful urination, on October 13, 2009. Dr. Chang could not say whether the vaginitis could have been caused

13

by a sexual encounter nine to ten months earlier. His records for A.S. did not note any other complaints of vaginal itching or burning.

### K.W.'s Testimony

Defendant also called K.W., A.S.'s uncle. K.W. identified the family home, where he continues to reside with A.S. and D.W., and stated that it is a single-story home. He testified that at some point during 2006, his hours at work changed and he would leave work at 4:45 p.m. instead of 2:45 p.m. He testified that defendant did not work during 2007. K.W. explained that he would pick up A.S. from school when D.W. was unable to do so. Although the precise dates were unclear, K.W. also testified that A.S. attended an afterschool program during 2006 and 2007 where she would sometimes stay at school until 6:00 p.m., and other times, one of her parents or uncle would pick her up earlier. K.W. also testified that during the years of 2006, 2007, and 2008, defendant and A.S. were alone in the house together two or three times during the week and nearly every weekend that D.W. worked. Finally, K.W. recalled that after defendant won the lottery, he gave K.W. $300 and purchased a computer and desk for the family.

### F.J.'s Statement

A.S.'s friend who reported the molestations to the principal, F.J., did not testify; the parties stipulated that her testimony would be consistent with her witness statement contained in Defense Exhibit H if called to testify. F.J. made the statement to Detective Lawrie on September 22, 2010, almost a year after A.S. reported the molestations to F.J. Detective Lawrie summarized F.J.'s statement to him as follows: "My friend [A.S.] told me when she was 3 or 4 years old her dad raped her. She told me this when we were at Six Flags last year. We were on a ride and she mentioned it and she told me not to tell anybody. She didn't go in to details except that if she lets him do it to her then he will buy her whatever she wants. She didn't tell me what he bought her though."

14

**Police Officer Testimony about Interviews with A.S.**

With the prosecutor's agreement, defendant was allowed to introduce the preliminary hearing testimony given by the investigating officers concerning their interviews of A.S.[6]

Detective Dean Lawrie testified that he observed A.S.'s SAFE interview and summarized his recollection of A.S.'s statements during the interview. In general, he accurately described the interview. However, he incorrectly testified that during her SAFE interview, A.S. "stated that the second time something happened he had her *go upstairs* into the mother's bedroom and he had her take her clothes off." (Italics added.) A.S. did not use the words "upstairs," "downstairs," "stairs," or any similar words in her SAFE interview, which is significant because the alleged molestations all occurred in the family's one-story house.

Officer Paul Curtis testified at the preliminary hearing that he interviewed A.S. in November 2009 following her school principal's report of the molestation. He stated that A.S. reported that her father had sexual intercourse with her ten times and that he "stuck his penis in her butt approximately three to four times." He said A.S. told him that during the molestations, defendant took her to the bedroom, but he did not recall A.S. describing the location of the bedroom as upstairs or downstairs. Officer Curtis testified that A.S. reported that the first molestation occurred right after defendant returned to the family home after his release from prison. The second incident occurred in December 2006.

**Verdict**

The trial court found defendant guilty as charged. In discussing the reasons for the conviction, the court explained to defendant that it found A.S. credible and defendant

---

[6] Defendant told the court that both officers were unavailable; one was on vacation and the other was on paternity leave. The prosecutor acknowledged that he was unable to subpoena either witness.

15

incredible: "I am convinced that the accusation that she ha[d] made against you is truthful, that it was not made to get you out of the home." The court went on to explain that because defendant was already out of the home and divorced from D.W. nearly a year before A.S. confided in F.J., A.S. "had no motive to repeat the accusation to [F.J.] or to stand by it in subsequent contacts with law enforcement and testify here at trial." Additionally, the court reasoned that A.S.'s various accounts of the molestations were "substantially consistent" with one another. The court said, "There are discrepancies around the edges, I believe, but I believe that they can be accounted for based on, perhaps, in some cases, misunderstanding of what she was saying." While the court agreed with defendant that the "timing and the circumstances of the initial fondling raise[d] a plausibility question," after considering all the evidence and testimony, the court concluded "beyond a reasonable doubt that it occurred." Similarly, the court was convinced that even if defendant were correct that A.S.'s accusation of exactly ten molestations was not temporally plausible, there was sufficient evidence of "at least five [instances of sexual intercourse] covering the time periods that were alleged in connections with Counts 2, 3, and 4."

The court pointed out that its verdict was not based on defendant's prior convictions: "I would have found the accusations to be truth [*sic*] beyond a reasonable doubt even if you had no prior criminal record." The court explained to defendant, "the decision for me was based substantially on [A.S.'s] testimony, I believe your testimony that suggests an alibi and suggests that you were in Southern California during critical times. I'm not persuaded that they exclude the possibility that the alleged crimes occurred within the time frames stated in the charging document. [¶] Your alibi was not sufficiently detailed to exclude the possibility that they occurred during those times. . . . [¶] I believe there was ample opportunity available for what [A.S.] alleged occurred to have occurred." Finally, the court noted that it found D.W.'s testimony substantially credible and that K.W.'s testimony did not affect the result "one way or another."

16

**Trial on the Prior Conviction Allegations,**
**Post-Conviction Motions, and Sentencing**

On December 13, 2011, the court found defendant's prior convictions true. Defendant's three qualifying prior convictions were for attempted robbery in 1977 when he was 19, bank robbery in 1986 when he was 29, and robbery in Texas in 1990 when he was 32.

On December 13, 2011, defendant filed a *Romero* motion to strike the strike allegations, contending that his prior strikes were remote and non-violent, he had no record of other sexual offenses, he had strong support from his family, and he had some education and various job skills. On the same day, defendant filed a motion for a new trial, alleging assorted errors including prosecutorial misconduct and that the verdict was contrary to law or evidence.

The court considered and denied both motions during the proceedings on December 13, 2011. After hearing argument on defendant's *Romero* motion, the court stated, "I cannot say that in this particular instance the punishment that would be imposed if I deny your motion to strike the strike convictions would be too severe, unreasonable, or disproportionate. [¶] I do concede that the sentences that these crimes carry without the strike convictions added are also severe and probably would adequately protect society given how old you are now. But I cannot say that you fall outside the spirit of the strike law if I were to impose the sentence for these prior convictions. You are exactly the kind of criminal that people had in mind when they enacted this law in California. [¶] You have three separate strike convictions spaced widely apart in time starting from a young age and going to well into your middle age. There are other crimes that you've committed within that time. You violated parole. You were on parole when these crimes with your daughter were committed. I cannot say that a just sentence requires me to strike any or all of the prior strike convictions. So I deny the *Romero* motion."

The court sentenced defendant to state prison for 223 years to life plus a determinate term of 60 years calculated as follows: 25 years to life on count one, 75 years to life on counts two and four, and 48 years to life on count three. Additionally, the court imposed 15 years per count for the three section 667, subdivision (a), serious felony enhancements. The court ordered that that defendant pay a restitution fine of $10,000 and a parole revocation fine of $10,000, as well as other fines and fees.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant contends there is insufficient evidence to support his convictions for all four counts. He argues that because there was no medical evidence demonstrating that defendant sexually abused A.S., "the case rested entirely on A.S.'s word." He contends that the trial court's finding that A.S.'s testimony was credible "is not supported by substantial evidence and [] her testimony in certain regards falls into the category of inherently improbable and thus insufficient to sustain the finding of guilt." To support this assertion, defendant first argues that A.S.'s testimony was improbable because it is illogical, and therefore unlikely, for a child molester to begin molesting a child with no knowledge of what her reactions might be.[7] Second, he argues that A.S.'s testimony is inherently improbable because defendant was absent from the home and in Southern California during the time when the second molestation allegedly occurred, which A.S. testified occurred about a week after the first molestation. Third, defendant points to

---

[7] We are perplexed by defendant's argument that A.S.'s testimony was improbable because "[i]t is simply not likely that [defendant] would return home after a six year absence and with no knowledge of what kind of child A.S. was and what her reactions might be, [and] immediately put his hands down her pants while her mother was in the shower." In his reply brief, defendant doubles down on this argument and claims that the first molestation "defies logic." While we agree that this behavior was senseless and illogical, as is typical among child molestations, we disagree that the senselessness of sexually assaulting a child while her mother is in the shower provides defendant an improbability argument on appeal.

18

inconsistencies between A.S.'s investigative interviews and her trial testimony regarding whether the molestations occurred in an "upstairs" bedroom and whether defendant sodomized A.S. Fourth, defendant contends that A.S. had a history of lying. Lastly, defendant argues that A.S.'s testimony is improbable because he was not alone with her in the home very often during the pertinent two-year time period.

When we review a claim that the evidence was insufficient to support a conviction, "the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573] (*Jackson*).) Under this deferential standard, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing from it. (*In re James D.* (1981) 116 Cal.App.3d 810, 813.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).) While defendant concedes that these are the applicable standards, he would seemingly have us ignore them.

The People contend that the evidence meets the three-part test of *Jones*, *supra*, 51 Cal.3d at page 316, which defendant did not reference in his briefing. We agree. In *Jones*, our Supreme Court addressed the evidentiary difficulties presented when children are molested over a period of time by someone close to them. In such cases, the child "may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any of such incidents." (*Id.* at p. 305.) The

*Jones* court balanced competing concerns presented in these cases: a child molester should not be immunized from criminal liability merely because he molested his victim repeatedly over an extended time period, yet a defendant has a due process right to notice of the charges against him and a reasonable opportunity to defend against those charges. (*Ibid.*)  Rejecting the argument that generic testimony is inherently insufficient, the *Jones* court reasoned:  "It must be remembered that even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction."  (*Id.* at p. 314.)

The *Jones* court held that a child victim's generic testimony about molestation is sufficient if the child is able to "describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy).  Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping').  Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period.  Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction."  (*Jones*, *supra*, 51 Cal.3d at p. 316.)

Further, our Supreme Court had held that the testimony of the victim is alone sufficient evidence to support a conviction:  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of

the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see *People v. Mayberry* (1975) 15 Cal.3d 143, 150; *People v. Allen* (1985) 165 Cal.App.3d 616, 623.) While a reviewing court will not uphold a judgment or verdict based upon evidence that is inherently improbable, testimony that merely discloses unusual circumstances does not come within that category. (*People v. Barnes* (1986) 42 Cal.3d 284, 306.) Evidence is inherently improbable when it is either physically impossible or its falsity is apparent without resorting to inferences or deductions. (*Ibid.*) " ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citation.]" (*Ibid.*)

Here, defendant was charged and convicted of four counts, one count of lewd and lascivious acts with a child under the age of 14 (§ 288, subd. (a)); two counts of sexual intercourse with a child 10 years of age or younger (§ 288.7, subd. (a)); and one count of substantial sexual conduct with a child under the age of 14 (§ 288.5, subd. (a)). Based on the dates alleged in the charging document -- effectively alleging the two sexual intercourse charges as the first and last acts of sexual intercourse and the substantial sexual conduct charge as acts of sexual intercourse that occurred in between -- the prosecution was required to prove only one lewd and lascivious act and five acts of sexual intercourse.[8]

---

[8] Section 288.5, subdivision (a), requires a showing of at least three acts of "substantial sexual conduct," such as sexual intercourse, or at least three acts of lewd or lascivious conduct, over a three-month period by a person residing in the same home with the victim or who has recurring access to the victim. (See also § 1203.066, subd. (b) [defining

21

As for the proof, A.S.'s testimony was very specific as to the circumstances of the molestations and the sexual acts. However, some of her testimony was generic regarding the time frame. A.S.'s testimony that defendant had sexual intercourse with her nine times over the course of two years, every time she was left alone in the house with him when her mother went to work and her uncle was absent, was corroborated by her mother's testimony that A.S. and defendant were often alone in the house together on the occasions she went to work. Additionally, K.W. testified that during the years of 2006, 2007, and 2008, defendant and A.S. were alone in the house together two or three times during the week and nearly every weekend that D.W. worked. While D.W. testified about working only five or six Kings games during the first half of 2007, her testimony and that of K.W. was sufficient to establish defendant's access to A.S. and support A.S.'s testimony that defendant engaged in sexual intercourse with her every time her mother went to work and she was alone with defendant, nine times in total over the course of two years. The molestations were not, as defendant asserts, inherently improbable where three witnesses testified that defendant was often left alone with A.S. while D.W. worked, and the evidence certainly satisfies the three-part *Jones* test. A.S. described the molestations in significant detail, gave the number of times they took place, and provided the time period when they occurred.

Although defendant characterizes A.S.'s testimony as inherently improbable, in actuality he asks this court to go beyond its province by considering the credibility of the witnesses and reweighing the evidence. (See *Maury*, *supra*, 30 Cal.4th at p. 403.) For example, he contends that A.S.'s testimony is inherently improbable because of her alleged history of lying and inconsistencies between A.S.'s police interviews and her trial testimony. These arguments boil down to credibility attacks on appeal after the trial

---

" 'substantial sexual conduct' " to include penetration of the vagina by the offender's penis].)

court, which watched both A.S. and defendant testify, expressly found A.S. credible and defendant incredible: "I am convinced that the accusation that she ha[d] made against you is truthful, that it was not made to get you out of the home." Additionally, the court found that because defendant was already out of the home nearly a year before A.S. confided in F.J., A.S. "had no motive to repeat the accusation to [F.J.] or to stand by it in subsequent contacts with law enforcement and testify here at trial." Further, the court specifically found that A.S.'s various accounts of the molestations were "substantially consistent" with one another. Appellate courts may not disturb factual findings on appeal where the testimony is sufficient under the *Jones* test for "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." (*Jackson*, *supra*, 443 U.S. at p. 319.)

Here, the inconsistencies defendant describes, if inconsistent at all, are minor. For example, while A.S. first reported to Officer Curtis that defendant put his penis in her buttocks, she later clarified at trial, that because defendant had touched her buttocks with his penis while he was having vaginal intercourse with her, she thought that defendant's penis had been inside her buttocks, but defendant never had anal intercourse with her. Additionally, at the SAFE interview, A.S. explained that defendant touched her vagina and in between her buttocks at the same time with his hand and arm during the initial fondling. The case was not prosecuted on a sodomy theory, and these inconsistencies between her first police interview and subsequent SAFE interview and trial testimony may be explained by her age and lack of sophisticated knowledge about her anatomy and sex.

Defendant misleadingly cites Detective Lawrie's incorrect testimony at the preliminary hearing that during A.S.'s SAFE interview, she "stated that the second time something happened [defendant] had her go upstairs into the mother's bedroom." In fact, as reflected by the video recording and transcript, she did not use the words "upstairs," "downstairs," or "stairs" during the interview.

23

The purported anal intercourse inconsistency, the "upstairs" red herring, and the other alleged inconsistencies defendant raises are either minor or not inconsistencies at all. Accordingly, we will not disturb the court's finding that A.S.'s various accounts of the molestations were "substantially consistent" with one another.

We conclude that the evidence is sufficient to support the verdicts.

## II. Advisory Counsel

### A. Background

During discussion of the in limine motions, the trial court asked defendant if he had been advised of his *Faretta* warnings and cautioned him against proceeding in pro per. The following colloquy took place:

"THE COURT: [Defendant], obviously, you've been advised that you're entitled to be represented by an attorney in this matter. [¶] Apparently, we have Faretta warnings that are in the file. [¶] You've been advised of what your Faretta warnings are, correct?

"[DEFENDANT]: Yes, sir.

"THE COURT: I can only imagine that someone advised [] you [that] this was a really bad idea to be representing yourself and that there are attorneys that handle these types of matters that are experienced attorneys and certainly would be --

"[DEFENDANT]: -- Your Honor, I was represented by the Public Defender's Office. And in one year, they put my case off numerous times, even know [*sic*] I asked for a speedy trial, and they never did anything the whole year. Never investigated the case, never did anything. [¶] At that point, I tried a Marsden motion. It didn't work. They said they were doing their job. I had no choice but in order to go to trial or defend myself.

"THE COURT: You do have a choice, and I'm not going to get into the details. I didn't hear the Marsden motion. [¶] But I simply would indicate that you haven't attended law school. [The prosecutor] obviously has. [¶] There are procedures that

24

occur in a courtroom that you're not going to be familiar with. I'm not allowed to help you out. I won't be helping you out.

"[DEFENDANT]: Uh-huh. *I understand that I am allowed an advisor, and I would request an advisor to help me with the courtroom procedures.*

"THE COURT: What you're entitled to and what I would do is appoint the attorney to represent you. [¶] I'm not going to get into a situation where I've got you representing yourself, an attorney sitting next to you giving advice and us having conflicts that could be created by that type of situation. [¶] I would be more than happy to appoint an attorney, to represent you and represent your interest because you're looking at a whole lot of -- potentially, if this thing doesn't work out the way you're hoping it's going to work out, you're looking at spending the rest of your life in jail. [¶] And it's not -- I'm mindful in looking at the charges that, going back to my routes [*sic*], 'This isn't your first rodeo.' [¶] You've been through the system for a long period of time [going] back into the seventies. The allegations are that you have prior convictions in each of the proceeding ten -- each of the decades 70's, 80's and the '90s. [¶] But, at the same time, it's important that you receive a fair trial. And having an attorney represent your interest would assist in ensuring that that happens. I will do that, but I'm not going to get into this in-between area of having some advisory person sit next to you. [¶] If you wish an attorney, I will appoint one.

"[DEFENDANT]: I am ready to go forward, your Honor." (Italics added.)

The court acknowledged defendant's decision and proceeded to address the in limine motions.

### B. Analysis

Defendant contends the trial court abused its discretion by refusing to appoint advisory counsel for him. We disagree.

A criminal defendant may waive the right to counsel, choosing self-representation. (*Faretta*, *supra*, 422 U.S. at pp. 807, 819-821.) The trial court has the discretion to

appoint advisory counsel to assist the defendant *if the defendant makes a showing of need*. (*People v. Crandell* (1988) 46 Cal.3d 833, 861-862 (*Crandell*), disapproved on other grounds by *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) In deciding whether to appoint advisory counsel, the trial court may consider "the reasons for seeking appointment of advisory counsel." (*Crandell*, at p. 863.) However, a defendant who elects to represent himself has no constitutional right to co-counsel, advisory counsel, or any other form of " 'hybrid' " representation. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1218; see *McKaskle v. Wiggins* (1984) 465 U.S. 168, 183 [79 L.Ed.2d 122, 136] [a defendant who elects self-representation "does not have a constitutional right to choreograph special appearances by counsel"].)

Whether to grant a request for the appointment of advisory counsel is left to the sound discretion of the trial court, and if " 'there exists "a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside . . . ." ' " (*Crandell*, *supra*, 46 Cal.3d at p. 863.) "[J]udicial discretion implies the absence of arbitrary determination, capricious disposition, or whimsical thinking. . . . Discretion is abused only if the court exceeds the bounds of reason . . . ." (*People v. Henderson* (1986) 187 Cal.App.3d 1263, 1268 (*Henderson*).) However, when a court exercises its sound discretion in declining to appoint advisory counsel, its decision should not be disturbed on appeal. (See, e.g., *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1431 [reasoning that "if (a defendant) is not able to represent himself without the assistance of advisory counsel, then he is not competent to represent himself"]; *Brookner v. Superior Court* (1998) 64 Cal.App.4th 1390, 1396 [criticizing the practice of appointing self-represented criminal defendants advisory counsel and characterizing it as " 'self-representation-plus' "].)

Here, the trial court did not abuse its discretion in denying defendant advisory counsel. Defendant never even attempted to make a showing of need. Indeed, defendant stated that he only wanted advisory counsel to "help with the courtroom procedures."

26

Moreover, he had already expressed considerable distrust of his prior court appointed counsel. "[T]hey put my case off numerous times, even [though] I asked for a speedy trial, and they never did anything the whole year. Never investigated the case, never did anything." Given defendant's hostility to attorneys, the trial court's concern that appointing advisory counsel could create conflicts in the case was appropriate.

In his opening brief, defendant concedes that he "was generally articulate [and] managed to follow proper procedure (i.e., timely file appropriate motions, make and argue/oppose evidentiary objections, question witnesses, and deliver argument to the court)." However, defendant still suggests that the defective areas of his performance at trial indicate that the trial court abused its discretion in denying him advisory counsel. We disagree. The consequential prejudice defendant alleges is the natural result of an untrained criminal defendant representing himself, and it does not demonstrate that the court abused its discretion when defendant indicated a desire for advisory counsel. In our view, defendant's argument merely attempts to do indirectly what he cannot do directly -- "a pro se defendant may not claim incompetent representation as a basis for reversal on appeal." (*Crandell*, *supra*, 46 Cal.3d at p. 856.)

Defendant points out that the complexity of the case is a factor courts consider. (See *People v. Clark* (1992) 3 Cal.4th 41, 111; *Crandell*, *supra*, 46 Cal.3d at pp. 863-864.) He contends that this factor cuts in favor of granting advisory counsel in this case because the case "involved extremely serious charges of child molest for which the consequences of conviction are extreme." He adds, "the handling of a child molest case from a defense perspective is a highly specialized undertaking requiring special skill and knowledge." Yet, defendant cites no peculiar or unique factual or legal issues in this case. As a consequence, his argument essentially equates to the notion that all self-represented defendants in child molestation cases are entitled to advisory counsel. Moreover, defendant's generic description about the seriousness of the charges and the consequences of conviction would apply with equal force to the multiple murder special

27

circumstance case in *Crandell*. Yet, our high court held that the "record [did] not demonstrate that denial of [the] defendant's request for advisory counsel would have been an abuse of discretion," had the trial court exercised discretion. (*Crandell*, *supra*, 46 Cal.3d at p. 864.)

Defendant highlights his purported errors in support of his claim he should have been given advisory counsel.[9] However, because the advisory counsel motion was made before trial, the trial court could not consider defendant's trial performance in exercising its discretion in deciding whether to appoint advisory counsel. (See *Crandell*, *supra*, 46 Cal.3d at pp. 862-864 [review of decision denying advisory counsel focused on factors available to court at the time of the motion].) To consider defendant's trial performance in deciding whether the trial court abused its discretion "would require us to hold the trial court to an impossible standard." (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 [consideration of facts that came out during the trial is inappropriate in determining whether the trial court abused its discretion in an evidentiary ruling made at the beginning of the trial].) Thus, defendant's performance at trial does not affect our inquiry into whether the trial court abused its discretion.[10]

---

[9] Defendant points to "his handling of the issue involving the Conflict Defender's Officer failure to turn over to him the complete discovery in the case such that he was unaware of the [F.J.] statement until after the People had concluded their case" and his failure to request a mistrial; his failure to ask that A.S. be held subject to recall so that he could have confronted her with the inconsistent statement reported by F.J. regarding how old A.S. was when the molests occurred; and his failure to offer any legal argument as to whether his Texas robbery conviction qualifies as a serious felony offense in California. Only his failure to ask that A.S. be held subject to recall relates to courtroom procedures. But on appeal, defendant does not explain why confronting A.S. about the inconsistency would have yielded helpful results, as opposed to backfiring on him. F.J.'s statement to the detective was made almost a year after A.S. reported the molestations to F.J.

[10] Review of a defendant's trial performance is appropriate, however, when determining whether the defendant has been prejudiced by the trial court's abuse of discretion. (*Crandell*, *supra*, 46 Cal.3d at pp. 864-866.)

28

Here, defendant made it clear he did not want representation, yet he wanted someone to help him with courtroom procedures. Still, he continued to express his distrust in his prior court appointed counsel, and the court was justified in predicting conflicts during trial. This case, despite defendant's generic complexity argument, was not that complex; nor were the courtroom procedures complex. The case involved a credibility contest and no esoteric legal issues. Under these circumstances, we cannot say the trial court's conclusion was an "arbitrary determination, capricious disposition, or whimsical thinking" outside the bounds of reason. (*Henderson*, *supra*, 187 Cal.App.3d at p. 1268.)

Accordingly, we conclude the trial court did not abuse its discretion in denying defendant's request for advisory counsel.

### III. *Romero* Motion

Defendant contends that the trial court abused its discretion in denying his *Romero* motion to strike his three qualifying prior convictions. (See *Romero*, *supra*, 13 Cal.4th at pp. 529-530.) Defendant contends the court should have exercised its discretion to strike the strike allegations, arguing that "[n]one of his offenses involved the use of a weapon, save the attempted robbery in which the person [defendant] attempted to rob hit [defendant] with a toy baseball bat that [defendant] had apparently brought to the crime. (2 RT 462.) He had no juvenile record. He had no record of the commission of any other sexual offenses. He was arrested for a parole violation in 2000 for failure to telephone his parole officer. (2 RT 466.) He had five behavior reports while incarcerated in county jail for the current offense consisting in the main of minor infractions and two fights with his cellmate. The record did not reflect the nature and extent of [defendant's] involvement in those fights, i.e., whether he or the cellmate started them, if anyone was injured, etc." We are not persuaded.

A trial court has the authority to dismiss strike conviction allegations in the interests of justice under section 1385, subdivision (a). (*Romero*, *supra*, 13 Cal.4th at

29

p. 504.)  We review the trial court's decision for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).)  "In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." '  [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " '  [Citations.]  Taken together, these precepts establish that *a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it*."  (*Id.* at pp. 376-377, italics added.)

In deciding whether to exercise its discretion to dismiss strike allegations, the trial court must determine whether the defendant should be deemed outside the spirit of the three strikes law "and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)  In making this determination the court must consider three factors:  (1) the nature and circumstances of his present felonies; (2) the nature and circumstances of his strike offenses; and (3) the particulars of the defendant's background, character, and prospects for the future.  (*Id.* at p. 161.)

## A.  The Nature and Circumstances of the Current Offenses

The trial court found the current offense "to be aggravated in [the sense that] it involves substantial sexual conduct with [defendant's] biological daughter when she was seven years old."  Stating that it "wasn't violence in the sense of inflicting corporal or physical injury," the court found that it was a "serious invasion of [his] daughter's person."

30

## B. The Nature and Circumstances of the Strike Offenses

Defendant had strike convictions in three separate decades, none of which were non-violent serious felony offenses. They all involved the use or threatened use of violence.

In 1977, defendant had a conviction for attempted robbery and an allegation that he personally used a deadly or dangerous weapon was found true. According to the probation report, the weapon was a baseball bat. At the *Romero* hearing, the prosecutor told the court that according to the police report, defendant entered a Radio Shack, used the baseball bat to simulate a weapon, and announced this is a hold up.[11] Defendant was sentenced to the California Youth Authority. Thereafter, he was paroled in 1979 and discharged from parole in 1980.

In 1986, defendant was convicted of bank robbery in federal court. He approached a teller with his hand under his shirt and announced, "This is a robbery." He then leaned over the counter, pointed to a stack of $20 bills, and told the teller, "Give me that or I'll shoot." The teller gave defendant $910 and he fled the scene. Defendant was sentenced to federal prison for five years.

In 1990, defendant was convicted of second degree robbery in Texas involving a robbery at a market. He was sentenced to 11 years.

## C. Defendant's Background, Character, and Prospects for the Future

In addition to the strike offenses, defendant had a number of other prior convictions. In 1976, he had misdemeanor conviction for taking or driving a vehicle without consent. In 1982, defendant sustained a conviction for felony forgery, and

---

[11] When defendant was arrested his clothes were blood stained. During the *Romero* motion hearing, defendant told the court, "It was my blood. The gentlemen I attempted to rob, which I had a toy baseball bat, he was a grown man. He battered me quite seriously, so that would have been my blood."

31

subsequently violated his probation twice. In 2009, defendant was convicted of driving under the influence and driving with a blood alcohol level of 0.08 percent or higher and placed on three years' probation.

Defendant told the court he had participated in the STAR program for substance abuse, as well as Narcotics Anonymous and Alcoholics Anonymous. He said he had not used drugs since 2007 and that he was willing to participate in any program the court or the Department of Corrections felt necessary.[12] When the court asked whether he had acquired any job skills, defendant said he is "a certified dental assistant," he has a certificate in data processing, and an AA degree. In response to the court's question about his job history, defendant listed the jobs he has held over the years.

### D. Summary

In ruling on the motion, the trial court indicated that it considered the proportionality of the punishment, defendant's age and background, his lifelong criminality, and his parole violations. The court explained to defendant each of the *Williams* factors. (*Williams*, *supra*, 17 Cal.4th at p. 161.) After considering the evidence related to those factors, the court ruled that defendant did not fall outside the spirit of the three strikes law. In explaining its ruling the court told defendant, "You are exactly the kind of criminal that people had in mind when they enacted this law in California. [¶] You have three separate strike convictions spaced widely apart in time starting from a young age and going to well into your middle age. There are other crimes that you've committed within that time. You've violated parole. You were on parole when these crimes with your daughter were committed. I cannot say that a just sentence requires me to strike any or all of the prior strike convictions. So I deny the Romero motion."

---

[12] We note that the probation report says that defendant told the author he last used cocaine in 2008 and has never participated in counseling or a rehabilitation program because he felt his substance use was not problematic.

We cannot say that the trial court's decision was so irrational or arbitrary that no reasonable person could agree with it. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) To the contrary, we agree with the trial court, in that the record demonstrates defendant fits the mold of the career criminal the voters and Legislature had in mind when the three strikes law was enacted.

## IV. Strike Allegation on Texas Robbery Conviction

### A. Background

After the trial court announced its verdict, defendant indicated that he desired a trial on the prior conviction allegations, noting that some of his convictions come from different jurisdictions. Regarding the Texas conviction, the prosecutor told the court he was providing the record of conviction, "which the pleading itself simply states that he took property by means of force or fear from the immediate person with the intent to deprive them." The prosecutor followed up by telling the trial court, "the Texas robbery statute in the second degree . . . has all the same elements as the California Penal Code." The case was continued for the trial on the convictions. Before adjourning, the trial court asked the prosecutor to "also look into the Texas statute."

During the trial on the prior convictions, the prosecutor told the court, "As it relates to the Texas robbery, the documents there show the face of it all the same elements that would be necessary in California . . . ." The trial court replied, "Yes. I noticed that."

Defendant contends that there was insufficient evidence to prove that his conviction for the Texas robbery was a prior serious felony within the meaning of section 667, subdivision (a), and the three strikes law, and accordingly, the case should be remanded for retrial on this enhancement allegation. The People concede this point. We agree and remand for retrial on the Texas robbery strike allegation if the prosecution so desires.

## B. Analysis

" 'When, as here, a defendant challenges on appeal the sufficiency of the evidence to sustain the trial court's finding that the prosecution has proven all elements of the enhancement, we must determine whether substantial evidence supports that finding. The test on appeal is simply whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the enhancement beyond a reasonable doubt.' [Citation.] In making this determination, we review the record in the light most favorable to the trial court's findings." (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 129 (*Rodriguez*).)

"A conviction qualifies for the five-year enhancement under section 667, subdivision (a)(1) if it includes all the elements of a serious felony." (*Rodriguez, supra*, 122 Cal.App.4th at pp. 128.) The Texas robbery statute differs considerably from robbery in California. (See §§ 211, 667.5, subd. (c)(9); see also Tex. Pen. Code, §§ 29.01, 29.02; *Rodriguez*, at pp. 129-130.)

In determining whether an out-of-state conviction is a serious or violent felony for purposes of the three strikes law and section 667, subdivision (a), enhancement, "the court may look to the entire record of the conviction to determine the substance of the prior foreign conviction." (*People v. Guerrero* (1988) 44 Cal.3d 343, 354-355 (*Guerrero*); see also *People v. Woodell* (1998) 17 Cal.4th 448, 452-453; *Rodriguez, supra*, 122 Cal.App.4th at pp. 128-129.) When the record does not disclose any of the facts of the offense actually committed, the reviewing court presumes that the prior conviction was for the least offense punishable under the out-of-state law. (*Guerrero*, at p. 355; *Rodriguez*, at p. 129.)

Contrary to the prosecutor's statement in the trial court, the pleading in the record before us states in pertinent part: "defendant, [¶] on are about June 5, 1990, . . . did then and there while in the course of committing a theft of property and with the intent to obtain and maintain control over the property, intentionally and knowingly threaten [the

34

victim] with and place him in fear of imminent bodily injury and death." The only other documentation submitted by the prosecution were documents related to defendant's guilty plea on October 16, 1990, and the judgment indicating that defendant was convicted of second degree robbery and sentenced to 11 years in state prison on October 31, 1990. The prosecution did not present evidence as to the facts underlying defendant's conviction or evidence regarding the definition of second degree robbery under Texas law. Instead, the prosecutor erroneously argued that "the documents [he presented] show [on] the face of it all the same elements that would be necessary in California."

The pertinent statute in effect at the time of defendant's conviction, Texas Penal Code section 29.02, defines second degree robbery as follows: "(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he: [¶] (1) intentionally, knowingly, or recklessly causes bodily injury to another; [¶] or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. [¶] (b) An offense under this section is a felony of the second degree." Texas Penal Code section 29.01 defines " '[i]n the course of committing theft' " as "conduct that occurs in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of theft." Finally, a theft occurs when a person "unlawfully appropriates property with intent to deprive the owner of property." (Tex. Pen. Code, § 31.03, subd. (a).) The California robbery statute, section 211, defines the crime as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Unlike the California robbery statute, the Texas robbery statute does *not* require asportation or that the property be taken from the immediate presence of the victim. (See Tex. Pen. Code, §§ 29.01, 29.02; *Rodriguez*, *supra*, 122 Cal.App.4th at p. 130 ["under Texas law, asportation has not been an element of robbery"].)

35

Relying on *Rodriguez,* defendant asserts the People's evidence was "insufficient to show that the Texas robbery qualified as a serious felony with[in] the meaning of Penal Code section [667, subdivision (a)] and the Three Strikes Law." In *Rodriguez*, the court analyzed this very Texas robbery statute where the defendant challenged the trial court's conclusion that his prior Texas robbery conviction constituted a prior serious felony conviction in California. (*Rodriguez, supra*, 122 Cal.App.4th at p. 126.) The *Rodriguez* court concluded that because, as in this case, the record did not disclose the facts of the out-of-state offense, "[w]e must accordingly presume that the 1976 conviction was for the least offense punishable under Texas law. [Citation.] Under the applicable Texas law, the offense of robbery did not require either asportation or the taking of property from the person or his or her immediate presence; both of these elements are necessary for robbery under California law. Because there is no evidence that appellant's robbery involved either asportation or taking property from the person or his or her immediate presence, the trial court's finding that appellant's Texas robbery conviction satisfied all of the elements of robbery under California law is not supported by substantial evidence." (*Id.* at p. 131.)

Here, like *Rodriguez*, the record of the Texas conviction that the People presented at trial does not disclose the facts underlying defendant's conviction and there is nothing in the record showing either asportation or taking property from the person or his or her immediate presence. Accordingly, we must presume that defendant's conviction was for the least punishable offense under Texas law. (*Guerrero, supra*, 44 Cal.3d at p. 355; *Rodriguez, supra*, 122 Cal.App.4th at pp. 129, 131.) Because the least punishable offense under the Texas statute does not require asportation or the taking of property from a person, as does California's robbery statute, defendant's out-of-state conviction does not include "all of the elements of the particular felony as defined under California law." (§ 667.5, subd. (f).)

Accordingly, we remand for retrial on the enhancement allegations relating to the Texas conviction.  (See *People v. Barragan* (2004) 32 Cal.4th 236, 239 [holding that the retrial of a strike allegation is permissible when the trier of fact finds the strike allegation true but the appellate court reverses]; *Rodriguez*, *supra*, 122 Cal.App.4th at pp. 137-138.)  Upon remand, the prosecution, if it so desires, will have the opportunity to present additional evidence to prove that defendant's Texas robbery qualifies as a serious felony under California law.  (*Rodriguez*, at p. 137.)

### DISPOSITION

We remand for retrial on the serious felony and strike allegations relating to defendant's Texas robbery conviction.  In all other respects, the judgment is affirmed.


                                     MURRAY          , J.



We concur:



     HULL           , Acting P. J.



     BUTZ           , J.


37